993 F.2d 1079
 Stephen Mark HAUSE, Plaintiff-Appellant,
v.
Ralph VAUGHT, Director; Joey Johnson, Captain, on behalf of
Horry County and in their individual and/or
official capacities at Horry County
Detention Center, Defendants-Appellees.
 No. 92-6328.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1993.
Decided May 7, 1993.
 
 Louis C. Ricciardi, Student Counsel, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, DC, argued (Steven H. Goldblatt, Director, John J. Hoeffner, Supervising Atty., Nancy Y. Tong, Student Counsel, Appellate Litigation Clinical Program, Georgetown University Law Center, on brief), for plaintiff-appellant.
 Clifford Leon Welsh, McCutcheon, McCutcheon & Baxter, P.A., Conway, SC, argued (John B. McCutcheon, Jr., McCutcheon, McCutcheon & Baxter, P.A., on brief), for defendants-appellees.
 Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 Stephen M. Hause brought this action pursuant to 42 U.S.C. § 1983 (1988) challenging his conditions of confinement while a pretrial detainee at the Horry County Detention Center, Conway, South Carolina. The district court, adopting the recommendation of a magistrate judge, granted summary judgment for the Defendants, all of whom are officials at the Detention Center. Finding no error, we affirm.
 
 
 2
 * Hause was detained at the Detention Center for three separate periods: from December 3 to December 19, 1989; from January 5 to March 1, 1990; and from March 9 to April 25, 1990. He raises five claims with regard to his confinement. First, he contends that the Detention Center's restrictions on the receipt of outside publications violated the First Amendment. Second, he contends that the legal assistance offered by the Detention Center was insufficient to provide him with meaningful access to the courts. Third, he urges that the Detention Center's requirement that detainees, when necessary, assist in cleaning the common areas of their cell-block violates his Fourteenth Amendment right to be free from punishment prior to conviction. Fourth, Hause contends that the Detention Center's policy of placing all incoming inmates (including himself) in administrative segregation upon entry into the Center violates inmates' Fourteenth Amendment due process rights. Fifth, Hause urges that the Detention Center disciplined him for violating Center rules without giving him constitutionally adequate notice of the Center's rules.
 
 
 3
 Hause initially sought both damages and injunctive relief. The district court determined that the claim for injunctive relief was moot, a determination that Hause does not challenge on appeal. Hause does challenge the district court's grant of summary judgment to the Defendants on his claims for damages. We review the district court's grant of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988).
 
 II
 
 4
 Hause challenges the Detention Center's policy of not permitting detainees to receive books and periodicals in the mail. He urges that the policy infringes upon his First Amendment right to receive information and ideas, as outlined in Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581-82, 33 L.Ed.2d 683 (1972). See Mann v. Smith, 796 F.2d 79, 83 & n. 3 (5th Cir.1986). The Detention Center allows detainees to correspond with their attorneys and families but, aside from this correspondence, it limits their contact with the outside world to the newspapers and books in the prison library and to cable television, which is available in each cell block.[1] At the time of Hause's confinement, the Detention Center was a new, state-of-the-art facility whose libraries had not been fully stocked due to delays caused by Hurricane Hugo.
 
 
 5
 In Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), the Supreme Court recognized that pretrial detainees retain constitutional protections despite their confinement. Nevertheless, "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual." Bell, 441 U.S. at 546, 99 S.Ct. at 1878. A detainee's First Amendment rights may be restricted in the interest of prison security. In Bell, for example, the Court upheld regulations that "permitted inmates to receive books and magazines from outside the institution only if the materials were mailed directly from the publisher or a book club." Id. 441 U.S. at 549, 99 S.Ct. at 1879. The Court concluded that the regulations were a "rational response by prison officials to an obvious security problem," namely, the smuggling of contraband. Id. 441 U.S. at 550, 99 S.Ct. at 1880.
 
 
 6
 The Court subsequently held in Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." In Thornburgh v. Abbott, 490 U.S. 401, 404, 109 S.Ct. 1874, 1876, 104 L.Ed.2d 459 (1989), the Court applied Turner in upholding restrictions placed on the receipt of outside publications by convicted prisoners. Although Thornburgh did not involve pretrial detainees, the concern for security is the same for pretrial detainees as for convicted inmates. Bell, 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28. We therefore apply the same legal standard for detainees as for convicted inmates with due regard for the particular circumstances of pretrial detainment. See id. 441 U.S. at 552, 99 S.Ct. at 1881. Accordingly, we shall apply the Turner standard to determine the constitutionality of the Detention Center's restrictions on receipt of publications.
 
 
 7
 In Turner, the Supreme Court applied what amounts to a two-part test. First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89, 107 S.Ct. at 2261 (internal quotation omitted). The Court emphasized that the governmental interest must be legitimate and neutral. Id. at 90, 107 S.Ct. at 2262. Once a rational connection to a legitimate governmental interest has been established, the second inquiry is whether the challenged regulation is reasonably related to that interest. In evaluating reasonableness, a court must consider whether "there are alternative means of exercising the right that remain open to prison inmates," as well as "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id.
 
 
 8
 [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.
 
 
 9
 Id. 482 U.S. at 90-91, 107 S.Ct. at 2262-63.
 
 
 10
 Plaintiffs bear the burden of showing that the challenged regulation is unconstitutional. Covino v. Patrissi, 967 F.2d 73, 79 (2d Cir.1992); see O'Lone v. Estate of Shabazz, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987). Some courts have placed upon prison officials the burden of showing that prison regulations serve some legitimate penological purpose. See Thornburgh, 490 U.S. at 414 n. 12, 109 S.Ct. at 1882 n. 12. (reserving issue of burden of proof, but noting that district court had imposed initial burden of production on prison officials); St. Claire v. Cuyler, 634 F.2d 109, 114-15 (3d Cir.1980) (state need only produce evidence showing "the exercise of first amendment rights would create a potential danger to institutional security," at which point burden shifts to plaintiffs to show that regulations are unconstitutional).[2] Hause, however, concedes that the Detention Center's policies are rationally related to the legitimate, neutral penological interest of preventing the use of publications to smuggle contraband and start fires. Thus, assuming Defendants had some burden of production, that burden has been satisfied.
 
 
 11
 Hause's challenge focuses on whether the Detention Center's ban on outside publications was reasonably related to the objective of preventing smuggling and fires. His principal argument is that an "obvious, easy alternative" to Detention Center policy existed that would have accommodated both the Detention Center's security concerns and his own desire for access to information: a "publishers-only" rule. Hause initially makes a facial attack on Detention Center policy based on cases such as Bell that have upheld a publishers-only rule as constitutional. Bell, 441 U.S. at 548-49, 99 S.Ct. at 1879-80 (describing challenged rule). Neither the Supreme Court nor this court, however, has ever held that a publishers-only rule is a minimum constitutional standard. We decline to do so here.
 
 
 12
 Hause also argues that a publishers-only rule offers an "obvious, easy" alternative under the facts of this case. In so doing, he fails to consider a central principle implicit in the Turner analysis. Bell, Turner, and Thornburgh all emphasize the deference owed to prison administrators in their management of penal facilities. Bell, 441 U.S. at 547, 99 S.Ct. at 1878; Turner, 482 U.S. at 89, 107 S.Ct. at 2261; Thornburgh, 490 U.S. at 407-08, 109 S.Ct. at 1878-79. Deference requires that courts not second-guess a prison administrator's choice among alternative policies unless an alternative exists that would meaningfully enhance an inmate's ability to exercise his constitutional rights.
 
 
 13
 We hold that a publishers-only rule would not constitute an alternative to the Detention Center's ban on publications because such a rule would not have meaningfully enhanced Hause's access to information and ideas. As a practical matter, most publications sent from publishers and book clubs will arrive after a detainee has been transferred to another facility or released from confinement. Hause has submitted no evidence showing that a person detained sixty days or less (like Hause) who ordered publications directly from the publisher would likely receive them prior to his release or transfer. Further, Hause's three periods of confinement were quite brief; hence, any denial of outside information was minimal. See Bell, 441 U.S. at 552, 99 S.Ct. at 1881 (noting that 60 day limitation on pretrial detainment influenced the court's decision to uphold the challenged regulation). Finally, nothing in the record indicates how much additional work a publishers-only rule would require of prison officials in sorting through packages and in forwarding them to departed detainees. See Thornburgh, 490 U.S. at 419, 109 S.Ct. at 1884 ("the administrative inconvenience of this proposed alternative is also a factor to be considered"). Without some evidence regarding the extent to which the proffered alternative would enhance an inmate's ability to exercise his constitutional rights, this court will not second-guess prison officials' regulatory choices.
 
 
 14
 Even if a publishers-only rule offered an alternative that would prevent smuggling, it would not address the Detention Center's legitimate concern that publications could be used to start fires. Of course, correspondence can also be used to start fires, but in our view the efforts of prison administrators to accommodate First Amendment rights by allowing inmates to receive correspondence should not be weighed against them in considering other measures adopted in the interest of security.
 
 
 15
 Hause also argues that the Detention Center did not offer enough alternative means of exercising his right of access to information and ideas. See Thornburgh, 490 U.S. at 417-18, 109 S.Ct. at 1883-84. In fact, the Detention Center offered correspondence with his family and attorneys, television, newspapers, and a limited library. Hause focuses his attack on the adequacy of the Detention Center's library. The library was not fully stocked because the facility was new and outside sources of reading material were unavailable in the aftermath of Hurricane Hugo. Limitations on an inmate's access to information cannot by themselves pose a constitutional problem where they are the result of natural disasters afflicting an entire community and not just the local jail. Because any alleged insufficiency in the means of communication available to Hause resulted from short-term, temporary conditions associated with a natural disaster, the alleged insufficiency cannot by itself form the basis of a constitutional claim.
 
 
 16
 On the facts before us, which involve a short-term detainee seeking damages for limitations placed on the exercise of his constitutional rights during previous periods of short-term confinement, we conclude that the Detention Center's ban on outside publications was reasonably related to penological interests, and hence constitutional.
 
 III
 
 17
 Hause's second claim is that the Detention Center denied him access to the courts. Under Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498 (1977), prisoners have a right to some form of meaningful access to the courts. This right can be satisfied either by providing prisoners with adequate law libraries or with adequate assistance from persons trained in the law. Id. at 828, 97 S.Ct. at 1498. Hause contends that the Detention Center complied with neither of these alternatives. Hause further contends that because he had insufficient legal assistance, he was unable to plead his civil claims properly and could not adequately prepare a motion for appointment of counsel. The Detention Center contends that Hause could have obtained legal assistance either from his court-appointed criminal attorney or from the Horry County Legal Assistance Program to which Hause was referred. Because the parties dispute whether assistance from these sources was forthcoming, we assume for purposes of appeal that it was not.
 
 
 18
 Hause's claim is without merit because he has not shown any actual injury. See Strickler v. Waters, 989 F.2d 1375, 1382 (4th Cir.1993) (discussing need to show actual injury). The result here is governed by our holding in Magee v. Waters, 810 F.2d 451 (4th Cir.1987). In Magee, we wrote:
 
 
 19
 In our case, Magee was a temporary occupant of the jail, only awaiting transfer. He advises us of no specific problem he wished to research and of no actual injury or specific harm which has resulted to him by his limited access to the jail library or its limited contents.
 
 
 20
 In such a situation, we do not believe that he has been denied any constitutional right within the meaning of Bounds v. Smith....
 
 
 21
 Id. 441 U.S. at 452-53, 99 S.Ct. at 1823-24.
 
 
 22
 The only evidence Hause offers of injury is a conclusory statement that he was unable to plead his claims properly or properly prepare his (unsuccessful) motion for appointment of counsel. We have examined Hause's motion and pleadings, together with the record as a whole, and are satisfied that the alleged lack of legal assistance did not affect the outcome either of his motion or of his various claims.
 
 
 23
 Hause contends that injury should be presumed because, unlike in Magee, no legal assistance at all was offered here. See Strickler, 989 F.2d at 1385-1386 n. 16 (reserving the question of whether "injury may be presumed where a total denial of access to a law library or legal assistance is alleged"). There may be circumstances under which the failure to provide any legal assistance at all merits a presumption of injury. Short-term detention, however, is not one of them.
 
 
 24
 Courts have recognized that whether and to what degree prisoners must be offered legal assistance may vary based upon the length of detention. See id. at 1385-1386. Determining when and to what degree legal assistance must be offered has, however, proved troublesome. See Morrow v. Harwell, 768 F.2d 619, 624 (5th Cir.1985) (noting that there is no "easily stated test" for determining how long a person may be detained before right is triggered); Penland v. Warren County Jail, 797 F.2d 332, 335 (6th Cir.1986) (ability to provide legal assistance may vary depending upon size of institution). This problem is partially solved by requiring proof of actual injury and not presuming damages. Our refusal to assume injury for short-term detainees recognizes that a detainee's claim is without merit where the detention period presumptively was not long enough for him to suffer prejudice from not having any legal assistance.
 
 
 25
 Because Hause has not shown "actual injury or specific harm," the district court properly granted summary judgment on this claim.
 
 IV
 
 26
 Hause's third claim is that the Defendants forced him to work even though he was a pretrial detainee. Hause's evidence on this claim consisted of the following passage from his affidavit:
 
 
 27
 On at least 2 different occasions I was intentionally threatened with punishment, without Due Process, in the form of 48 hours lock-down in my cell if I refused to work as a Pre-Trial Detainee[.] [T]his violated my 13th Amendment Rights.... The work I was forced to do by defendants did not entail cleaning up my cell, which I did willingly, but involved cleaning up the whole 'module' several times a day....
 
 
 28
 (J.A. 60, pp 11 & 13.) Beyond the fact that the work involved cleaning, Hause did not specify what work he was required to do.
 
 
 29
 Hause asserts that his forced participation in a cleaning detail violated his right under the Due Process Clause not to be punished prior to a conviction for some crime. As we held in Martin v. Gentile, 849 F.2d 863, 870 (4th Cir.1988):
 
 
 30
 [T]he pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of "punishment." But not every inconvenience encountered during pre-trial detention amounts to "punishment" in the constitutional sense. To establish that a particular condition or restriction of his confinement is constitutionally impermissible "punishment," the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate non-punitive governmental objective, in which case an intent to punish may be inferred.
 
 
 31
 (Citations omitted.)
 
 
 32
 The only evidence that in any way supports finding an intent to punish is the work assignment itself. Hause, however, provides no details regarding the work he had to do as part of cleaning the "module" where he was housed. Indeed, we cannot tell from the record before us whether Hause's duties amounted to anything more than dusting. One cannot reasonably infer from Hause's characterization of his cleaning duties that the Defendants intended to punish him.
 
 
 33
 In an analogous case, Bijeol v. Nelson, 579 F.2d 423, 424 (7th Cir.1978), the Seventh Circuit concluded that an inmate could be required to help clean his living unit area, which included his cell and a common room. The court reasoned that "[d]aily general housekeeping responsibilities" are not inherently punitive and do not violate either the Due Process Clause or the Thirteenth Amendment's ban on involuntary servitude. Id.; accord Martinez v. Turner, 977 F.2d 421, 423 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1658, 123 L.Ed.2d 277 (1993). Because none of the evidence indicates that the cleaning assignments here amounted to more than "general housekeeping responsibilities," we conclude the cleaning assignments were not inherently punitive. We also conclude that the cleaning assignments were related to the legitimate, non-punitive governmental objective of prison cleanliness.
 
 V
 
 34
 In Hause's fourth claim, he challenges the Detention Center's policy of placing all incoming detainees in administrative segregation for five days before releasing them to the general prison population. The Defendants explain that the time spent in segregation allows the detainees to acclimate to their new environment and allows Detention Center officials to evaluate the detainees before they enter the general population.
 
 
 35
 The Supreme Court has sanctioned the use of administrative segregation, but has cautioned that it "may not be used as a pretext for indefinite confinement of an inmate." Hewitt v. Helms, 459 U.S. 460, 468, 477 n. 9, 103 S.Ct. 864, 869, 874 n. 9, 74 L.Ed.2d 675 (1983). Because the period of administrative segregation in this case was limited to five days, it was obviously not being used as a "pretext for indefinite confinement." Hence, Hause's allegations lack merit.
 
 VI
 
 36
 Hause's final claim is that the Detention Center violated his procedural due process rights by failing to provide him with a copy of the Center's rules and regulations during his confinement. The Defendants acknowledge that inmates were not individually provided with copies of the rules because they were being revised during Hause's confinement, but claim that interim rules were posted throughout Hause's confinement. Hause admitted that "memorandums" were posted on a bulletin board in the Detention Center, but contends that the rules were only followed when it suited the Defendants.
 
 
 37
 In Gaston v. Taylor, 918 F.2d 25, 27-28 (4th Cir.1990), a panel of this court recognized that an inmate has a due process right to notice of proscribed conduct before imposition of a "severe" sanction. The panel decision in Gaston was superseded when rehearing was granted en banc. 946 F.2d 340 (4th Cir.1991) (en banc). The en banc court did not address whether the challenged sanction implicated due process because the plaintiff had conceded on rehearing that constitutionally sufficient notice had in fact been provided. Id. at 342-43. We believe the initial panel was correct in recognizing that minor sanctions inflicted for rule infractions do not "invoke a constitutional notice requirement." 918 F.2d at 28.
 
 
 38
 On appeal, Hause claims he was sanctioned twice for failing to follow rules of which he had no notice. First, he claims that he was "deadlocked" in his cell one hour earlier than other inmates because he overslept and failed to get up when called by a guard. This punishment is not sufficiently severe to implicate the due process concerns of adequate notice. Second, Hause claims that he was forced to help clean his cell module under threat of punishment. While Hause claims that he was threatened with punishment, he does not claim that the cleaning assignment itself was imposed as a result of his failing to follow some rule or regulation. Hause's claim is thus without merit.
 
 VII
 
 39
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 Although some evidence before the district court also indicated that magazines were available to detainees, this fact is disputed. For purposes of this appeal, we assume magazines were unavailable
 
 
 [2]
 The Third Circuit modified its position in a later case, Shabazz v. O'Lone, 782 F.2d 416, 420 (3d Cir.1986) (en banc), placing a heavier burden upon prison officials. The Supreme Court later reversed Shabazz. O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)