James M. COX, et al. Plaintiffs

v.

CITY OF JACKSON, A Municipal Corporation Defendant

No. 3:94–CV–623WS.

United States District Court, S.D. Mississippi, Jackson Division.

June 18, 2004.

Edward P. Lobrano, Jr., Lobrano, Butler & Kirk, Ridgeland, MS, for plaintiffs.

Paul M. Neville, Neville & Wilson, Romaine L. Richards, Romaine L. Richards, Special Assistant, Office of the Attorney General, Mississippi State Dept. of Health, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Tried before this court sitting without a jury, this lawsuit reflects the massive unrest in the City of Jackson, Mississippi, Police Department (hereinafter "JPD") generated by the sharp, palpable tension between its rank-and-file officers and its police chief, Jimmy Wilson. Aggrieved over a potpourri of concerns, plaintiff James M. Cox and 167 of JPD's "tenured,"[1] uniformed officers brought this lawsuit urging this court to address matters of promotion, training, transfers, job assignments, automobile assignments, clothing allowances and equipment allocation. Resultantly, say plaintiffs, they have been deprived of certain rights, privileges, and immunities secured by the Constitution of the United States, namely the right to due process,[2] as well as the right to equal protection of the law, freedom of speech, and freedom of assembly.[3] Seeking declaratory, injunctive and monetary relief pursuant to Title 42 U.S.C. § 1983,[4] plaintiffs' complaint asks for compensatory damages in the amount of $3,000,000.00 and punitive damages in the amount of

---

1. The plaintiffs refer to themselves in their complaint as being "tenured employees" of the City of Jackson Police Department. The City of Jackson has not contested this assertion.

2. Section I of Amendment Fourteen to the United States Constitution provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

3. Amendment I to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

4. Title 42 U.S.C. § 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for re-dress."

$7,000,000.00. In paragraph XIV of the plaintiffs' amended complaint, they seek relief jointly and severally pursuant to Rule 20(a)[5] of the Federal Rules of Civil Procedure.

This court has jurisdiction over this matter predicated on Title 28 U.S.C. § 1331 (federal question) and Title 28 U.S.C. § 1343(a)(3).[6] Since the plaintiffs also assert state law claims, most allegedly arising under Mississippi Code Annotated, § 21–31–1, *et seq.*,[7] Mississippi's laws pertaining to Civil Service, this court exercises supplemental jurisdiction over those claims under Title 28 U.S.C. § 1367.[8]

This court, having heard the testimony of witnesses and the arguments of counsel, now is prepared to enter its findings of fact and conclusions of law in accordance with Rule 52(a)[9] of the Federal Rules of Civil Procedure.

## I. THE APPLICABLE CONSENT DECREES

Plaintiffs complain that certain actions taken by former Chief of Police Jimmy Wilson (hereinafter "Chief Wilson" or "Wilson") between 1992 and 1994 regarding promotions and transfers violated the provisions of those federal Consent Decrees applicable to the hiring and promotion process of the Jackson Police Department. On March 25, 1974, the City of Jackson and several of its departments, in

5. Rule 20(a) of the Federal Rules of Civil Procedure provides in part that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence ... and if any question of law or fact common to all these persons will arise in the action." Generally, permissive joinder of plaintiffs under Rule 20 is at the option of the plaintiffs, assuming they meet the requirements therein set forth. *Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 574 (5th Cir.1995). Furthermore, Rule 20 requires that all of the plaintiffs' claims arise out of the same transaction or occurrence and that there is a common issue of fact or law. *See Demboski v. CSX Transportation, Inc.*, 157 F.R.D. 28, 29–30 (S.D.Miss.1994).

6. Title 28 U.S.C. § 1343(a)(3) provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

7. Mississippi Code Ann. § 21–31–1 provides in relevant part that, "(1) A civil service commission is created in every municipality described in subsection (2) which has a full paid fire and police department. (2) The provisions of subsection (1) of this section shall apply to: (a) Any municipality, operating under a commission form of government, and having a population of not less than fourteen thousand (14,000), according to the federal census of 1940; ..." See the particular statutes applying to this case starting at page 555.

8. Title 28 U.S.C. § 1367(a) provides that, "[e]xcept as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

9. Rule 52(a) states in pertinent part that, "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; ...."

response to various lawsuits charging racial discrimination, entered into separate affirmative action Consent Decrees, one covering the entire City of Jackson and its employees, and others concerning specific departments such as the Jackson Police Department.[10] The primary purpose of these Consent Decrees was to remedy the effects of past discrimination and increase the distribution of African–American employees for the City of Jackson and its departments.

The Consent Decree entered in *United States of America v. City of Jackson*, J74–66(N), required the City of Jackson to adopt and seek to achieve a goal for hiring African–Americans for one-half of all vacancies in all job classifications, subject to the availability of qualified applicants, until such time as the proportion of blacks to whites in each such classification equaled the proportion of blacks to whites in the working age population of the City of Jackson.

The Consent Decree in *Corley v. Jackson Police Department*, 73J–4(C), which incorporates by reference the *United States of America v. City of Jackson* Consent Decree, requires the Jackson Police Department to establish separate promotion eligibility lists for white and black employees. Promotions to supervisory positions and to the ranks above Patrolman must be made alternately from each eligibility list in a one-to-one ratio until the proportion of African–Americans in supervisory positions and in the ranks above Patrolman substantially equal the propor-

tion of blacks to whites in the working age population of the City of Jackson.

Additionally, pursuant to the Consent Decree in *United States of America v. City of Jackson*, vacancies in all positions with the Jackson Police Department shall be filled by members of the affected class in order of seniority. The Consent Decree in *Corley v. Jackson Police Department* was entered on behalf of a class which includes all current black employees of the Jackson Police Department. The City of Jackson and its various departments are bound to act in accordance with the provisions of the Consent Decree or Decrees applicable to the respective departments.

In order to assure compliance with the applicable Consent Decrees, the Jackson Police Department is required to file all reports, tests, validation studies, plans, standards and any other criteria for promotion with the United States Department of Justice (hereinafter Department of Justice) for purposes of review and approval.

## II. APPLICABLE CIVIL SERVICE RULES

Plaintiffs also contend that Chief Wilson's actions violated state law and the Civil Service Rules of the City of Jackson. Mississippi Code Annotated § 21–31–1, *et seq.*, sets forth Civil Service requirements for transfer and promotion for municipalities throughout Mississippi, to include fire and police departments. Mississippi Code Annotated § 21–31–9 provides in pertinent part that "[i]t shall be the duty of the civil

---

**10.** The plaintiffs in *Corley v. Jackson Police Department*, Civil Action No. 73–J–4, filed suit in 1973 under Title 42 U.S.C. §§ 1981 and 1983 charged that the Jackson Police Department engaged in racial discrimination against black applicants and employees. Evidence was presented in that case showing that from its formation until 1963, the JPD had employed no black officers, and that at the end

of 1972, only 19 out of 302 officers were black. Further, of the 106 police officers in supervisory positions, only 1 was black. In light of these disparities, although not expressly admitting liability, the Jackson Police Department agreed to adopt a course of affirmative action and a consent decree eventually was entered.

service commission to make suitable rules and regulations not inconsistent with the provisions of sections 21–31–1 to 21–31–27. Such rules and regulations shall provide in detail the manner of conducting examinations, appointments, promotions, transfers, reinstatements, demotions, suspensions and discharges, and may also provide for any other matter connected with the general subject of personnel administration . . . ."

Furthermore, Mississippi Code Annotated § 21–31–13 provides in pertinent part that "[t]he provisions of sections 21–31–1 to 21–31–27 shall include all full paid employees of the fire and/or police departments of each municipality coming within its purview, including the chiefs of those departments. All appointments to and promotions in said departments shall be made solely on merit, efficiency, and fitness, which may be ascertained by open competitive examination and impartial investigation . . . ."

Rule VII "Civil Service Rules for the City of Jackson Mississippi" provides that "no appointing authority shall appoint, engage, or employ any person in the Classified Service, except in accordance with the established rules of this Commission."

Section 9 of Rule VI requires the establishment of "eligible lists." Vacancies are to be filled by selecting the employee to be considered for the position from a list of eligibles having the highest standing on the appropriate eligible list. Section 7 of Rule VI provides that eligible lists of candidates who have been duly qualified in order of merit and fitness shall be established by the Civil Service Commission. Paragraph 1.3 of Section 8, Rule VI, notes that promotions shall be based on qualifications, examinations, records, character, conduct and seniority.

Section 1.2 of Rule V provides that "[i]n order to become an applicant, the interested person must meet the minimum qualifications prescribed for the announced/authorized position."

According to the plaintiffs, all these requirements were ignored by Chief Wilson with regard to promotions and transfers within the Jackson Police Department between 1992 and 1994.

### III. FACTUAL BACKGROUND

Because the City of Jackson Police Department could not promote persons to the ranks of Sergeant, Lieutenant and Captain without Department of Justice approval as required by the aforesaid Consent Decree, Chief Wilson implemented the position of "Commander." General Order No. 100–5 of the Jackson, Mississippi, Police Department issued by the authority of Chief Wilson on July 1, 1992, provides in pertinent part for the creation of the position of "Commander" and specifies that this position would be filled by any employee of the *rank of Sergeant and above.* According to this General Order, the person selected would have command and control of a specific Division or Precinct. General Order No. 100–5 also states that the person selected for this position would be subordinate only to the Chief of Police, the Assistant Chief or the Deputy Chief; would have additional duties and responsibilities; and would receive additional compensation in the amount of $150.00 per month.

This position, particularly the manner in which Chief Wilson made appointments to this position, is a major dispute in the instant lawsuit. The plaintiffs contend that during a period time between 1992 and 1994, Chief Wilson appointed police officers with *no* tenure, experience or proper qualifications to the position of Commander without following proper procedures for announcing these positions;

without conducting competitive interviews; without permitting qualified police officers to apply for these positions; and without following the provisions of the applicable Consent Decrees. Plaintiffs also complain that desirable transfers within the Jackson Police Department were made in an arbitrary manner by Chief Wilson with no apparent regard for the Jackson Police Department's transfer policy. At least two of the plaintiffs, both Sergeants on the police force, filed Grievance Reports regarding the appointment of persons to the position of Commander to no avail. Additionally, at least one of the plaintiffs filed a Grievance Report regarding Chief Wilson's deviation from the transfer policy, but he obtained no relief.

The other claims of the plaintiffs pertain to such matters as job assignments, clothing allowances, radios with one frequency, automobile assignments, being ordered to perform certain tasks, being ordered to remain silent, and the effect of shift transfers on part-time jobs. The court shall take up each of these matters in turn.

### A. *Chief Wilson's Handling of the Commander Position*

As noted previously, General Order 100–5 provided that only policemen who had attained the rank of Sergeant and above were to be considered for the position of Commander. The rank structure for the Jackson Police Department is as follows: Patrolman; Police Sergeant; Police Lieutenant; and Police Captain. Beyond Police Captain are the management positions of Assistant Chief, Deputy Chief and Chief of Police. Because promotions to these positions required United States Justice Department approval, Chief Wilson added the position of Commander just above the rank of Captain, presumably in order to make up for the lack of supervisory personnel on the force.

None of the plaintiffs quarrels with the institution of the Commander position by Chief Wilson; rather, they contend that the procedures followed by Chief Wilson in the selection of Commanders were unfair and violated the plaintiffs' constitutional rights. Furthermore, say plaintiffs, the unfair procedures followed by Chief Wilson were ratified by the City of Jackson.

For example, the plaintiffs contend that General Order 100–5 was not disseminated in a manner which permitted the plaintiffs to avail themselves of the opportunity to apply for the Commander position, and that no promotional examination was given. Moreover, say plaintiffs, the provisions of General Order 100–5 applicable to the position of Commander were not followed by Chief Wilson or the City of Jackson. Indeed, Dr. George Terry testified that Chief Wilson, the maker of the policy regarding the position of Commander, knew that he was appointing persons to fill Commander positions in a manner inconsistent with General Order 100–5.

In support of their contention that Chief Wilson did not follow the established policy with regard to selecting qualified officers to fill the Commander position, the plaintiffs have submitted several Special Orders of the Jackson, Mississippi, Police Department showing that persons who had not yet attained the rank of Sergeant were selected to fill Commander positions. For instance, Special Order 3000.23 issued on September 24, 1993, announced that one Joe Austin, a Patrolman and not a Sergeant, had been elevated to the position of Commander. Personnel Order 91–01 shows that one Robert Pope, an officer with minimal time on the force, was elevated from the position of Range Instructor to "Range Commander." Thereafter, according to Special Order 3000.30 dated November 4, 1993, Commander Pope was placed in command of Precinct 2 of the

Patrol Division. Then, pursuant to Special Order Number 1000.38 dated November 15, 1993, patrolman Edna Drake was elevated to the rank of Commander retroactively to August 1, 1993. On May 5, 1994, pursuant to Special Order 3000.50, Drake was made commander of the Youth Services division. Special Order Number 2000.14 shows that Patrolman E.D. Gibson was assigned to the Administrative Services Division on June 23, 1993, then, on March 23, 1994, by Special Order Number 3000.42, he was promoted to Commander.

So, the plaintiffs argue that the actions of Chief Wilson rendered General Order 100–5 meaningless because individuals below the rank of Sergeant were selected and placed in the Commander positions by Wilson in a manner which ignored not only the requirements of General Order 100–5, but also the seniority provisions of the applicable Consent Decrees. Plaintiffs show that senior officers, both black and white, with as much as fifteen to twenty years experience were passed over without being given the opportunity to be considered, while persons who had been on the police force less than three years were being selected. Chief Wilson, say plaintiffs, did not conform his actions to the provisions of the applicable Consent Decrees.

The plaintiffs contend that qualified officers were not even permitted to apply for the Commander positions. In support of this contention, the plaintiffs submitted the testimony of Sergeant Louie Brooks. Sergeant Brooks stated that he was not permitted to apply for a Commander position, notwithstanding his 22 years with the police force, college education, and years of experience as an investigator.[11] Brooks complained of what he viewed to be the irrational policy of placing inexperienced officers in command authority over sea-

soned veteran police officers. Brooks complained that failure to follow the orders, even the imprudent orders, of one so designated as a Commander by Chief Wilson could invoke dire consequences.

Sergeant Walter Ainsworth complained that Special Orders pertaining to the Commander position were not disseminated in a manner which would inform qualified officers of the rank of Sergeant and above that the positions were open. Thus, the ability to apply for these positions in a timely fashion was undermined.

Sergeant Watson Marsalis, a veteran police officer with a degree in criminal justice who was pursuing a masters degree at Mississippi College, testified that he was aggrieved by the failure of Chief Wilson properly to announce the Commander position and permit qualified officers to compete for appointment. Marsalis stated that he met all the qualifications for the Commander position as announced in General Order 100–5. According to Marsalis, however, he only found out about the Commander position by watching on television a news story which reported on those officers selected for and appointed to the new positions. Marsalis stated that he filed a Grievance Report concerning the failure properly to announce the various Commander positions and that his grievance summarily was denied without hearing.

Moreover, say plaintiffs, once Chief Wilson became aware of the discontent in the ranks regarding his handling of the Commander position, he attempted to create the appearance that he had followed a consistent policy with regard to the appointment of Commanders by amending the relevant portion of General Order 100–5 on January 24, 1994, and making the position of Commander open to "all per-

---

11. Sergeant Brooks also has obtained a Certi- fied Public Accountant's license.

sonnel—whether civilian or policeman and regardless of rank." Plaintiffs argue that this action by Chief Wilson was nothing more than a disingenuous attempt to cover up the intentional and unreasonable abuse of his authority.

### B. Dr. George Terry and the Grievances Over the Commander Position

Dr. George Terry, Director of Personnel for the City of Jackson, was the person in charge of the Grievance Procedure in its initial stages. Dr. Terry acknowledged that grievances had been filed by Jackson police officers who considered themselves qualified for appointment to the position of Commander.

Dr. Terry referred to the position of Commander as a "designation with supervisory authority." This position became necessary, according to Dr. Terry, because the City of Jackson "was short of personnel to head up units as a result of U.S. Justice Department actions prohibiting promotions." (See Exhibits P–27 and P–28). Dr. Terry testified that the City of Jackson viewed the implementation of the Commander position as a necessary interim measure until a promotion procedure acceptable to the Department of Justice could be put in place. Furthermore, Dr. Terry stated that, in his opinion, the position of Commander was not part of the rank structure of the Jackson Police Department.

Sergeant Jerry W. Barrett filed one of the Grievances mentioned by Dr. Terry. Barrett's grievance was that officers of the

ranks of Sergeant and above were not receiving fair treatment because the formal rank structure [12] of the City of Jackson's Police Department and General Order 100–5 promulgated by Chief Wilson were being disregarded in the selection of persons for the position of Commander. Barrett's Grievance Hearing was conducted before Dr. George Terry in the presence of Chief Wilson and others on January 31, 1994. Barrett's argument at the Grievance Hearing was that, according to General Order 100–5, only persons above the rank of Sergeant should have been considered for the position of Commander; yet, persons who were new to the police force and persons who had failed to qualify for promotions were being given this position with authority over ranking officers as high as Captain. Meanwhile, qualified officers were not being considered for the position. Sergeant Barrett also contended that the authority given to the position of Commander by General Order 100–5 conflicted with the rank structure for the Jackson Police Department already in place.

Chief Wilson responded that the position of Commander was a rank within the structure of the Jackson Police Department because he said that it was, and because he made all decisions for the Jackson Police Department. As an example of Chief Wilson's draconian measures and arbitrary management style, the plaintiffs submit Exhibit P–19, a colloquy between Chief Wilson and Sergeant Barrett at the Grievance Hearing:

---

**12.** The City of Jackson's formal rank structure for the Police Department appears in Exhibit D–5, which includes the City of Jackson Compensation Plan. The parties agree that this is the official document pertaining to the Jackson Police Department rank structure. The job titles start with Police recruit and progress through the positions of bailiff; Firearms Instructor; Police Officer (also referred to as Patrolman); Master Police Officer (awarded after five years of service); Police Sergeant; Police Lieutenant; Police Captain; Deputy Police Chief; and Assistant Police Chief. Exhibit D–5 includes a complete description of the duties and responsibilities pertaining to all of these positions.

BARRETT: ... In one of these particular cases, we have a man that has competed in the promotional process in the past and has not been able to make rank and now he's given this title, which now entitles him to have control over, by this new General Order, by ... control over people as high as Captain. And, of course, by the original General Order, also. The new General Order just says that ... the authority of a rank just above Captain, which, just out of curiosity, what is that rank? Deputy Chief is the next step in our rank structure.

WILSON: No. Commander is the next rank.

BARRETT: But, Commander is not a rank.

WILSON: It is a rank.

BARRETT: Well, it's still written in these General Orders as being a title.

WILSON: Well, very well. It's a rank.

BARRETT: OK. I'm not wanting to argue, Chief. I just, out of curiosity, now it's a rank because we're here?

WILSON: Well, you said you didn't know. You wanted somebody to tell you?

BARRETT: Yes, sir.

WILSON: The only person that can tell you is the person making decisions for the Police Department.

BARRETT: OK.

WILSON: I'm telling you. It's a rank.

Clearly, Chief Wilson responded as he did in order to thwart any attempt by Barrett to challenge the authority of the Commander position as being outside the rank structure, and to avoid the salient point, that General Order 100–5 initially provided for only those employees holding at least the rank of Sergeant to be considered for the position.

Dr. Terry concluded the Grievance Hearing, took all matters under advisement, then signed and issued his first findings and recommendations regarding Sergeant Barrett's Grievance Hearing on February 11, 1994 (Exhibit P–27). This document sets forth Dr. Terry's initial agreement with Sergeant Barrett. Dr. Terry agreed that assignment to the position of Commander was restricted by General Order 100–5 to employees with the ranks of Sergeant and above. This conclusion also rejected Chief Wilson's attempt to revise General Order 100–5 retroactively on January 21, 1994. Dr. Terry also concluded in the first version of his findings that the position of Commander could remain in the force structure until such time as the Department of Justice approved the City of Jackson's promotional procedures.

Dr. Terry, however, expressed concern about the Commander position remaining in the force structure after Department of Justice approval, stating that, "[i]t is my opinion that the organizational health of the Police Department will be improved when supervisory authority reflects the official rank structure." Notwithstanding his conclusion that the Commander position was open only to those police officers with the rank of Sergeant and above, Dr. Terry still recommended no specific relief for Sergeant Barrett in the first version of his findings and recommendations.

Sergeant Barrett testified that he was informed by telephone to come by and pick

up a copy of Dr. Terry's findings. According to Sergeant Barrett, he went to Dr. Terry's office and found the February 11, 1994, document lying on a desk near the front door. Barrett says that as he stood reading the document, a secretary appeared and took the document away from him, saying that it was not yet ready.

Then, on February 23, 1994, Dr. Terry issued the second version of his findings and conclusions (Exhibit P–28). This second version concluded, just as the first version had, that the position of Commander was necessary pending approval by the Department of Justice of the Jackson Police Department's promotion procedures for the positions of Sergeant, Lieutenant and Captain. This second version of Dr. Terry's findings approved Chief Wilson's appointments to the position of Commander, and abandoned Dr. Terry's previous conclusion that the position of Commander is restricted to employees holding the ranks of Sergeant and above. Thus, Dr. Terry's findings adopted both Chief Wilson's retroactive revision of General Order 100–5 dated January 21, 1994, and his appointments to fill the Commander positions.

The inference submitted to the finder of fact in this case is that Dr. Terry succumbed to pressure exerted by Chief Wilson and changed his findings to comport with the Chief's wishes. The plaintiffs also submit this as another example of Chief Wilson's efforts to manipulate the system to his own ends rather than follow the guidelines that he himself had instituted.

All plaintiffs contend that their constitutional rights have been violated by Chief Wilson and the City of Jackson by the handling of the appointments to the position of Commander.

## C. *The Matter of Transfers*

All plaintiffs contend that they were denied opportunities for transfer to desirable vacancies where they might receive promotions and pay increases. Plaintiffs also complain that desirable transfers within the Jackson Police Department were made in an arbitrary manner by Chief Wilson with no apparent regard for the transfer policy set forth in General Order Number 200–20 (see Exhibit P–1). This General Order states that deployment of personnel is the responsibility of the Chief of Police and requires posting a vacancy announcement which is developed by the unit, section or division seeking to fill a vacancy. The vacancy announcement must be widely distributed and candidates must be selected through a competitive process. This competitive process is found in General Order 300–2 which sets forth the manner in which vacancy announcements are posted; the application process; and the selection process. General Order 300–2 provides in part that all vacancies are to be filled by qualified officers already assigned to the division. If vacancies are to be filled by transfer from other parts of the Jackson Police Department, then the selection is to be made from an "applicant list."

This court finds no difference between the "applicant list" referred to in General Order 300–2 and the "eligible list" referred to in the Civil Service Rules for the City of Jackson. The candidates then must be ranked and the top three considered for the vacancy (or the fourth or fifth candidate if the first three are unavailable). The Deputy Chief is charged with the task of preparing justification memoranda regarding the top three candidates. The Assistant Chief provides commentary on the top three under consideration and the Chief of Police then selects the person to occupy the vacancy based on the informa-

tion and recommendations presented to him.

Notwithstanding the foregoing procedures set forth in General Order 200–20, plaintiffs contend that Chief Wilson circumvented policy either by utilizing a "temporary appointment" process or simply by summarily appointing persons to vacancies regardless of whether the persons met the qualifications. The plaintiffs submit the following personnel orders and other special orders as examples of Chief Wilson's lack of regard for proper transfer procedures:

Personnel Order 92–08 shows that Officer Royce Pennington was temporarily assigned to the Special Investigations K–9 unit on April 30, 1992. Then, pursuant to Special Order 1000.01, Chief Wilson made Pennington's temporary appointment permanent without further action;

Special Order 1000.36 announced a vacancy in the Homicide/Robbery Division. This announcement stated, among other things, that candidates for this vacancy must have at least three years of experience; must have attended training seminars; and must have completed the Jackson Police Department's basic investigative course. Notwithstanding these qualifications, plaintiffs submit Special Order 3000.29 which shows that Patrolman Amy Barlow was appointed to this position even though she had less than three years of experience, had not attended any training seminars, and had not taken the basic investigative course.

Patrolman James Cox testified that he filed a Grievance Report concerning Amy Barlow's selection for transfer to the opening in the Homicide/Robbery Division. Cox complained that he had refrained from applying for the transfer despite his fifteen years of experience because he had not taken the Jackson Police Department's basic investigative course. Then, when Cox

discovered that Amy Barlow had been selected, even though she did not meet the qualifications for the vacancy, he submitted his Grievance Report through the chain of command. The comments of the supervisors who reviewed Cox's Grievance Report state that Cox's grievance was a valid one and that Amy Barlow was not qualified to fill the vacancy in the Homicide/Robbery Division. Nothing, however, was done to correct the situation or to provide Cox any relief. According to Cox, he was told by Chief Wilson that nothing would be done concerning the Grievance Report and that Amy Barlow would remain on the job.

Plaintiffs also submit evidence showing that even those officers who were selected for transfers pursuant to Chief Wilson's arbitrary practices were aggrieved by Chief Wilson's failure to follow established policy. Patrolman Gwendolyn Nix testified that she was appointed to and transferred to a vacancy in the Fugitive Unit by Chief Wilson, in spite of her misgivings about taking the position. Nix says she was reluctant to take the job because she had no experience in this area and because it would cause her to have to give up a lucrative part-time job. According to Nix, the vacancy was never announced; no tests were required; and, says Nix, she was assigned to this position despite her unfamiliarity with the workings of the office. Nix says her requests for assistance and for training went unheeded and eventually she was removed from the job because of Chief Wilson's dissatisfaction with her performance. According to Nix, this unfortunate circumstance would not have occurred if proper procedures regarding transfers had been followed by Chief Wilson.

Officer Jeff Myers, like Officer Nix, also complained about being selected for an undesired transfer. Myers says he was

transferred to the "Flex" criminal intelligence team not long after having completed the training academy course. Thereafter, says Myers, he suffered emotional distress because he was not allowed to associate with his peers, and because he became the subject of scorn from senior officers for his having been being assigned to Flex in spite of his lack of experience and seniority.

Officers Donnie Rutledge, Lawrence Epps and Michael Cox all testified that they, too, were denied opportunities to transfer to specialized units and preferred positions due to Chief Wilson's failure to post vacancy announcements in accordance with proper procedure, and due to Chief Wilson's employment of the temporary appointment process to circumvent the requirements of General Order 200–20.

## D. Various Claims Asserted by Individual Plaintiffs

The plaintiffs who have not attained the rank of Sergeant and who do not claim to have been denied a transfer due to Chief Wilson's arbitrary conduct in ignoring the City of Jackson's transfer policy raise individual claims against the City of Jackson.

The first of these individual claims was presented by the testimony of officer Alvaline Baggett.[13] According to Baggett, while she was assigned to the Vice and Narcotics Division of the Jackson Police Department, she was treated differently from the other four officers assigned to that Division in that she was prohibited from attending the training seminars her male co-workers were permitted to attend. Officer Baggett says that she complained about the situation and subsequently was transferred to a less desirable shift. This transfer, says Baggett, cost her the loss of her part time job due to her inability to change her shift to accommodate her new police job schedule. Consequently, says Baggett, she suffered financially and emotionally.

Officer Brian Carver testified that he was denied the opportunity to participate in motorcycle traffic training and that he was not considered for the vacancy in the Homicide Division to which Amy Barlow was appointed. While Carver may have lacked the requisite qualifications for the Homicide Division vacancy, he reasoned that he was no less qualified than Barlow.

Sergeant Bidwell Owens testified that his First Amendment right to Freedom of Speech was violated when he was given a direct order by a superior officer to subject himself to verbal castigation by the father of a homicide victim. According to Owens, if the father of the victim had a legitimate complaint concerning Owens' competency, this was a matter which should have been processed through the Jackson Police Department's Internal Affairs Division. Owens acknowledges though that he was permitted to speak once the father had his say. The record shows that Owens responded sympathetically and eloquently to the father's suffering.

Former Officer Cordilia Bailey, Officer James McGowan and Detective Keith Freeman all testified that they were deprived of their respective constitutional rights by the failure of the City of Jackson to follow its own General Orders regarding the announcement of vacancies and transfer opportunities.

---

**13.** Alvaline Baggett was convicted by jury verdict on September 29, 2000, of one count of bribery concerning a program receiving federal funds pursuant to Title 18 U.S.C.A. § 666, and one count of interference with commerce by threats or violence pursuant to Title 18 U.S.C. § 1951. *See* Criminal No. 3:00cr00065. This conviction and subsequent sentencing have no bearing whatsoever on this lawsuit.

Officer Calvin Matthews complained that he was denied a clothing allowance while serving on the Direct Action Response Team (DART), even though other units received a clothing allowance. Matthews acknowledged that the DART unit's clothing allowance was suspended because of the amount of overtime these officers were permitted to work.

Former Officer Larry K. Gatewood stated that he was misled by advertisements in the local newspapers setting forth the job benefits to be enjoyed by a Jackson police officer, and that the misrepresentations contained in the newspapers caused him to become a police officer to his detriment. Gatewood also complained that he was required to wait an inordinate amount of time for a requested transfer.

Detective Charles M. Foreman, Jr., complained that he was reprimanded for striking an unruly prisoner 1½ years after the incident occurred in order to disqualify him from taking a promotional examination. Due to delays in the administration of the test, Foreman was able to take the test anyway because the period of ineligibility imposed upon him had expired. Foreman also complained that he was forced to work in an office environment where no security was provided, and that communications equipment provided for his use by the Jackson Police Department was inadequate.

Officer James McGowan complained that he was put to work in an unsafe environment without proper equipment. According to McGowan, the communications equipment provided to officers working in his assigned area was inadequate because it operated on only one frequency. This limitation, says McGowan, caused him to suffer a beating by street thugs one evening because the one frequency was being used by another officer, and he was unable to call for backup.

Officer James B. French complained that he was forced to serve as Commander of the Intelligence Division without rank or title and no increased pay or benefits, notwithstanding the increased responsibility and work load. French also complained that while serving in this capacity he was ordered to admonish a superior officer for working too much overtime.

Officer Jonathan Crawford stated that he was moved to another less desirable work shift because he told the girlfriend of an interim Chief of Police that he was making more money on his part-time job than he was as a policeman. Crawford says he was unable to maintain the part-time job after his transfer because the shift transfer was in direct conflict with his part-time job hours.

Officer William Gladney claimed that his constitutional rights were violated when disciplinary action was taken against him. According to Gladney, this disciplinary action kept him from taking a promotional test. Gladney also testified that he was demoted from his position as case management officer; given an old marked car in place of his newer unmarked car; and forced to reapply for the case management position that he had held for 14 years. According to Gladney, this action was discriminatory because the requirement to reapply for the case management job had never been applied to any other Division in the police department. Gladney acknowledged, however, that his entire Division had been required to reapply for their positions when the case management division of the police department was reorganized.

Officer Deric Hearn, President of the Jackson Police Officers Association at the time of this trial, claims denial of equal protection because was assigned to a detective unit but was not given the same

benefits enjoyed by other detective units in the Jackson Police Department hierarchy. Hearn also says he was prohibited from applying for positions in the Drug Enforcement Unit and the Special Investigation Division in Internal Affairs because he lacked the requisite years-in-service. The years-in-service requirement, says Hearn, was not required of other officers who applied for these vacancies. Hearn attributed his treatment to his involvement with the Jackson Police Officers Association, and contended that his First Amendment right to freedom of association was violated.

Officer Virvil Finley testified that he was ordered into dangerous situations to make controlled purchases of illegal drugs without being outfitted with any means to communicate with his supporting officers. According to Finley, another female member of the same unit in which he served was always given communication devices when making controlled purchases. Finley also complains that he was denied a clothing allowance when other similarly located units were given clothing allowances.

Finally, Officer Nicky Temple said that he was asked to direct an officer to quit giving out traffic tickets, even though state law requires officers to ticket persons who travel too slowly and consistently in the left lane.

## IV. *RELIEF SOUGHT BY THE PLAINTIFFS*

The complaint sets forth a claim for compensatory damages on behalf of all plaintiffs in the amount of $3,000,000.00 and punitive damages in the amount of $7,000,000.00. As noted at the beginning of this Memorandum Opinion and Order, the plaintiffs seek relief on behalf of all, jointly and severally, pursuant to Rule 20(a) of the Federal Rules of Civil Procedure. Rule 20(a) permits the plaintiff's to join in one action if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence ... and if any question of law or fact common to all these persons will arise in the action. The common occurrence asserted by the plaintiffs relates to the alleged misconduct of Chief Wilson and the City of Jackson as set forth above. The complaint also seeks injunctive relief, asking this court to enjoin all the conduct by the defendants complained about in this lawsuit. All the plaintiffs claim to have suffered distress in some form because of the actions taken against them by Chief Wilson and the City of Jackson.

At the end of this trial, this court asked plaintiffs' counsel what constitutional violation had been proved and what damages the plaintiffs sought. Counsel replied that the constitutional right which had been violated was equal protection under the Fourteenth Amendment. Counsel for the plaintiffs stated that a proper remedy would be monetary damages in the amount of $10,000.00 per plaintiff, roughly $1.7 million, plus injunctive relief to assure that proper procedures are followed by the City of Jackson and the Jackson Police Department with regard to the matters of appointing Commanders, transferring officers to other departments, denying free speech and association, and placing the officers in dangerous situations. The plaintiffs also seek reasonable costs and attorney fees.

## V. *APPLICABLE LAW*

 The only defendant named in the plaintiffs' second amended complaint is the City of Jackson, a Municipal Corporation. The plaintiffs' constitutional claims are brought pursuant to Title 42 U.S.C. § 1983 (see footnote 3). Any unconstitutional conduct alleged by the plaintiffs must be di-

rectly attributable to the City of Jackson through some sort of official action or imprimatur. *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001). Isolated unconstitutional actions by municipal employees will almost never trigger liability. *Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Three attribution principles assist the court in the process of distinguishing individual violations perpetrated by local government employees from violations that can be fairly identified as actions of the government itself—a policymaker; an official policy; and the "moving force" of the policy. *Piotrowski,* 237 F.3d at 578. This court now shall determine whether these factors are present in the instant case.

### A. Who was the Policymaker?

The Fifth Circuit has defined an "official policy" for the purposes of § 1983 liability to be either: (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law-making officers *or by an official to whom the lawmakers have delegated policy-making authority* (emphasis added); or (2) a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Williams v. Kaufman County,* 352 F.3d 994, 1013 (5th Cir.2003) (quoting from *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984), *aff'd on reh'g,* 739 F.2d 993 (5th Cir.1984)); *Scott v. Moore,* 85 F.3d 230, 234 (5th Cir.1996), citing *Webster.*

█ In the instant case, General Order 100–1 of the Jackson Police Department dated July 1, 1992, provides that written policy and procedures established by the Chief of Police will be published in the forms of General Orders, Special Orders, and Roll Call Training Bulletins. General Order 100–1 explains that Special Orders are written orders "issued by the Chief of Police and relating to departmental personnel assignments, special events and legal matters." Exhibit D–4 is a compilation of all General Orders issued on July 1, 1992, pursuant to the subscribed authority appearing at the bottom left hand corner of each document—Chief Jimmy Wilson. Similarly, all Special Orders presented as evidentiary documentation in this lawsuit are subscribed by Chief Wilson as the promulgator of the policy or personnel action in question. General Order 100–5 describes the Chief of Police as *a highly responsible administrator who directs and coordinates the activities of the Jackson Police Department, who exercises considerable independent judgment frequently and who works under the supervision of the Mayor* (emphasis added). General Order 100–6 states that the Chief of Police *will formulate the comprehensive goals and objectives for the Jackson Police Department* (emphasis added).

In this court's view, these documents clearly establish that Chief Wilson was the policymaker for the City of Jackson Police Department during the time in question, *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984), and *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992), and that the City of Jackson either fully adopted or knowingly acquiesced in Chief Wilson's policy-making authority for all Police Department matters.

This view is supported by the testimony of Dr. George Terry, Director of Personnel for the City of Jackson, who said that Chief Wilson was the policy-maker for the Jackson Police Department. While Dr. Terry also added that Chief Wilson's policy was subject to the Mayor's approval, it is

clear to this court that the Mayor did not make policy for the Jackson Police Department; instead, the Mayor's function was merely executive in nature, controlling the prerogative of the purse, and retaining power to limit or take away the policy-making authority which clearly was in possession of the Chief of Police.[14] All of these factors persuade this court that Chief Wilson was the policymaker for the City of Jackson Police Department.

### B. What was the Official Policy Relating to the Plaintiffs' Claims?

■ The City of Jackson may only be held liable in this case if the constitutional harm claimed to have been suffered was the result of an "official policy, custom, or pattern." *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 2035–37, 56 L.Ed.2d 611 (1978). Municipalities may not be held liable under either a theory of *respondeat superior* or vicarious liability. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 817, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell,* 98 S.Ct. at 2036; *Doe v. Taylor Independent School District,* 15 F.3d 443, 452 (5th Cir.) (en banc), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). The City may not be held liable under § 1983 for mere negligence in oversight. *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992), citing *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). So, in order to hold the City of Jackson liable in this case, the plaintiffs must show that their constitutional deprivation was caused by the city's

adoption of (or failure to adopt) the particular policy in question. *Hare v. City of Corinth,* 74 F.3d 633 (5th Cir.1996). Moreover, any alleged inadequacy in a municipal policy must amount to an intentional choice to adopt or not to adopt a particular policy, and not merely an unintentionally negligent oversight. *Id.*

■ As noted previously, the official policy for appointment to the position of Commander appears in General Order 100–5. This General Order established that only those officers who had attained the rank of Sergeant and above as of July 1, 1992, would be considered for the position. Consequently, officers having attained the ranks of Sergeant and above had a legitimate expectation of entitlement to be considered for the positions of Commander in accordance with General Order 100–5. This General Order was promulgated by Chief Wilson. The City of Jackson acknowledges that it is bound by this written policy.

■ Additionally, General Orders 200–20 and 300–2 contain the official policy of the Jackson Police Department with regard to transfers. The official policy and procedures are set forth in detail above. All plaintiffs, if they met the stated qualifications for the transfer in question, had a legitimate expectation of entitlement to be considered for desirable transfers in accordance with General Orders 200–20 and 300–2. These General Orders also were promulgated by Chief Wilson, and the City of Jackson does not deny that it was bound by the written policy.

---

**14.** In *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir.1984), the Fifth Circuit described a final policymaker as one who governs not only conduct, but also one who sets goals and devises the means to attain those goals. Policymakers, said the Fifth Circuit, act in place of the governing body in their area of responsibility. The governing body retains the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official. Moreover, said the Fifth Circuit, relinquishment of the policy-making role is more likely to exist and be necessary as the size and complexity of government increases. *Id.* at 769.

█ Clearly, official policies existed with regard to promotion to Commander and with regard to inter-departmental transfers. This court, however, does not discern an established municipal policy regarding the other matters raised by various plaintiffs such as one-frequency capable radio equipment, assignments to position resulting in officers being shunned from association, denial of a wire, insufficient security, reduced or eliminated clothing allowances, giving orders to superiors, telling certain officers not to issue traffic tickets, losing part-time jobs outside the Police Department, and the miscellaneous other assertions made by certain plaintiffs. No evidence of any official policy regarding these matters has been presented by the plaintiffs. Only those claims based upon the implementation or execution of a policy or custom which was officially adopted by the City of Jackson will give rise to liability under § 1983. *Krueger v. Reimer,* 66 F.3d 75, 76 (5th Cir.1995); *Johnson v. Moore,* 958 F.2d 92,93 (5th Cir.1992).

### C. *Is the City of Jackson the Moving Force Behind the Alleged Violations?*

█ As previously has been discussed, Chief Wilson was the maker of all official policy for the Jackson Police Department. Where a Police Chief is the official vested with administrative and policy-making authority, the Police Chief's acts or omissions as policy-maker may subject both him and the city to § 1983 liability. *Webster v. City of Houston,* 735 F.2d at 841. Even a single decision may create municipal liability if that decision was made by a final policy-maker responsible for that activity. *Cozzo v. Tangipahoa Parish Council,* 279 F.3d 273, 289 (5th Cir.2002); *Brown v. Bryan County, Oklahoma,* 67 F.3d 1174, 1183 (5th Cir.1995); *City of St. Louis v. Praprotnik,* 485 U.S.

112, 124–25, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988); *Turner v. Upton County, Texas,* 915 F.2d 133, 136–37 (5th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). Moreover, the existence of a well-established officially-adopted policy will not insulate the municipality from liability where the policy-maker departs from the formal rules. *Gonzalez v. Ysleta Independent School District,* 996 F.2d 745, 754 (5th Cir.1993), citing *Praprotnik,* 108 S.Ct. at 928; and see *Jett v. Dallas Independent School District,* 7 F.3d 1241, 1247 (5th Cir.1993), citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (the official must ... be responsible for establishing final government policy respecting such activity before the municipality can be held liable).

In the instant case, Chief Wilson promulgated the General Orders establishing policy for the Jackson Police Department and made the decisions to circumvent this policy with regard to the selection of employees to fill Commander positions and the selection of employees to be transferred to other positions within the Jackson Police Department. The City of Jackson took no steps to review Chief Wilson's actions for compliance with these General Orders constituting official policy and, in the end, Wilson's decision to circumvent general Order 100–5 and his attempt to retroactively modify this General Order clearly were ratified by the City of Jackson when the Director of Personnel for the City of Jackson ruled favorably on the decision of the Chief of Police to hire persons below the rank of Sergeant with nominal time in service and to retroactively modify General Order 100–5 to make it appear that proper procedure had been followed. In this manner, Chief Wilson's actions became the official practice of the City of Jackson.

Finally, it is clear that Chief Wilson failed to follow General Orders 200–20 and 300–2, and the Civil Service requirements under both Mississippi law and the Civil Service Rules of the City of Jackson with regard to filling vacancies which occurred in the Homicide/Robbery Division and other units of the Jackson Police Department. Transfer polices were ignored by Wilson. He consulted no lists of eligibles (applicant lists) when he made his selections. The entire procedure for creating and considering lists of eligibles was circumvented and/or ignored. Thus, this court finds an official policy was established and imposed by Chief Wilson regarding promotions and transfers which subjects the City of Jackson to liability under § 1983.

Therefore, this court is unable to accept the first conclusion suggested by the City of Jackson that it is bound only by the written policies set forth by Chief Wilson's General Orders and Special Orders. This would be tantamount to permitting the City of Jackson openly to support Wilson's written policies, while tacitly approving actions by Wilson which undermine individual rights. Now, with these matters having been brought to light through litigation, the City of Jackson seeks simply to retreat behind the facially constitutional written policy and avoid liability for the actions actually taken by Wilson. Certainly, the City of Jackson's liability in this case cannot be based on isolated unconstitutional action by a "rogue" employee. *Piotrowski v. City of Houston*, 237 F.3d at 578.

█ Next, this court cannot accept the premise that the City of Jackson's actions (or inactions) in the instant case did not extend beyond mere negligent oversight of the plaintiffs' constitutional rights. This court finds the evidence most supportive of the conclusion that Chief Wilson's failure to follow General Orders 100–5, 200–20 and 300–2, as well as the provisions of the applicable Civil Service procedures and Consent Decrees, constituted deliberate abuse of his governmental power. This abuse was only aggravated by Chief Wilson's attempt to retroactively legitimize his capricious course of action with regard to selecting Commanders by modifying General Order 100–5 in January of 1994. Dr. Terry's testimony establishes that he, as the City of Jackson's Director of Personnel, was fully aware of Chief Wilson's actions. Dr. Terry was a witness to the colloquy between Chief Wilson and Sergeant Barrett at Barrett's Grievance Hearing where Chief Wilson showed clearly that he held no regard for the written provisions of General Order 100–5. Furthermore, considering the way the evidence shows that transfers were handled, it may be inferred that Chief Wilson held little or no regard for any other General Orders promulgated under his authority. As Chief Wilson's comments to Sergeant Barrett made perfectly clear, it was Wilson who was making the decisions for the Jackson Police Department between 1992 and 1994. The evidence points to no one other than Chief Wilson who might have been responsible for policy regarding the Jackson Police Department. As the final policy-maker for the Jackson Police Department, Chief Wilson's deliberate disregard for General Order 100–5 and the applicable Consent Decrees when selecting persons for the position of commander; his deliberate disregard for the General Orders 200–20 and 300–2 regarding transfers; his failure to follow the Civil Service Rules at least with regard to transfers, if not the position of Commander; and his capricious selections of persons to fill all vacancies between 1992 and 1994 all were known to the City of Jackson and combine to visit § 1983 liability upon the City of Jackson. *Gonzalez v. Ysleta Independent School District*, 996 F.2d at 754 (holding that a municipality may not insulate itself

from § 1983 liability where the final policy-maker departs from the written policy).

### D. What Constitutional Rights Have Been Violated?

 As noted previously, the plaintiffs claims under § 1983, and the City of Jackson's ultimate liability, if any, must be based upon the implementation or execution of a policy or custom which was officially adopted by that body's officers. *Krueger v. Reimer,* 66 F.3d at 76; *Johnson v. Moore,* 958 F.2d at 93. The evidence must establish that (1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) the custom or policy served as the moving force behind the violation; and (4) a constitutional violation occurred.[15] *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987). The first three factual foundations having been established, this court moves now to the fourth, what constitutional violation has been shown.

#### 1. The First Amendment

 This court finds no link to any violation of the First Amendment to the United States Constitution in the instant case. A public employee's right to free speech under the First Amendment is violated if the employee was penalized for speaking as a citizen upon matters of public concern. *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); and *Perry v. Sindermann,* 92 S.Ct. at 2697. The Fifth Circuit has estab-lished a three-part test to determine whether particular speech by a public employee is protected from public employer retaliation. First, the speech must have involved a matter of public concern. Secondly, the public employee's interest in commenting on matters of public concern must outweigh the public employer's interest in promoting efficiency. The third prong of the test is based on causation: the employee's speech must have motivated the decision to discharge or penalize the employee. *See Wallace v. Texas Tech University,* 80 F.3d 1042, 1050 (5th Cir. 1996).

 In the instant case, Officer Bidwell Owens complained that he was forced to sit silently and listen to excoriating criticism from the father of a murder victim. According to Owens, he was permitted to speak in his defense after the father had finished. Officer Owens then addressed the father's pain and loss, expressing his sympathy and assuring the father that Owens was not the type officer who would do the things the father believed Owens had done during the investigation of the murder scene.

 Owens does not show that he was penalized in any way for speaking out on any matter of public concern.[16] Furthermore, it was established later that Owens was not the officer who had done the things the father believed he had done. The testimony on this matter shows that Owens' more immediate concern during the confrontation was for the victim's father than with vindicating himself. Officer

---

**15.** Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. *Johnston v. Harris County Flood Control District,* 869 F.2d 1565, 1573 (5th Cir.1989). "Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Id.*

**16.** The First Amendment shields speech "not only [from] direct limitations ... but also [from] adverse government action against ... individual[s] because of [their speech]," including the denial of public benefits to punish individuals for their speech. *Colson v. Grohman,* 174 F.3d 498, 508 (5th Cir.1999). None of these elements is established in the instant case.

Owens' response was courteous, professional, and a credit to the Jackson Police Department.

■ Furthermore, this court finds no violation of the freedom of association. The United States Supreme Court recognizes that the First Amendment protects a right of association in two lines of cases. *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989). First, the choice to enter into and maintain certain intimate human relationships is protected as an element of personal liberty. *Id.* (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). Secondly, the Supreme Court has recognized a right to associate for the purpose of engaging in expressive activities protected by the First Amendment. *Id.* The Constitution does not include a "generalized right of 'social association.'" *City of Dallas,* 109 S.Ct. at 1595.

■ This court heard the testimony of Officer Derric Hearn, the current President of the Jackson Police Officer's Association. According to Officer Hearn, he was told essentially that his "union" activities might be a hindrance to his career. This is the only evidence offered in support of Hearn's assertion. This court simply has not heard sufficient evidence to support any claim that Officer Hearn or any other plaintiff was retaliated against or penalized because of his/her involvement with the Jackson Police Officers Association.

■ This court also has heard the testimony of Officer Jeff Myers who complained that he had not been allowed to associate with his peers after he had been transferred to the "Flex" team, a unit of the police department's intelligence division. As noted above, the United States Constitution simply does not protect any generalized right of social association.

Myers does not show that the City of Jackson penalized him for engaging in activity protected under the First Amendment.

## 2. Equal Protection under the Fourteenth Amendment

■ The plaintiffs have stated in closing argument that their main assertion against the City of Jackson is violation of equal protection guaranteed under the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause essentially requires that all persons similarly situated be treated alike. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). A party who wishes to make out an Equal Protection claim must prove "the existence of purposeful discrimination" motivating the state action which caused the complained-of injury. *See McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); and *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995), quoting *United States v. Galloway,* 951 F.2d 64, 65 (5th Cir.1992). Moreover, the group or classification must antedate the challenged state action in order to show purposeful discrimination. *Johnson v. Rodriguez,* 110 F.3d 299, 307 (5th Cir. 1997). "It cannot tenably be maintained that the state selected a particular course of action to harm an 'identifiable group' when that body did not exist until after the state acted." *Id.*

In the instant case, the plaintiffs have not shown that they are an identifiable group, nor have they shown that Chief Wilson purposefully sought to impose an adverse impact upon any specific group. Rather, the proof shows that Chief Wilson followed the course of action that he did with regard to promotions and transfers in spite of any adverse impact it might have had on the police officers not selected for promotion to Commander or for transfer to a desirable assignment.

The United States Supreme Court has established clearly that disparate impact alone cannot suffice to state an equal protection violation; otherwise, any law could be challenged on equal protection grounds by whomever it has negatively impacted. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2051–2052, 48 L.Ed.2d 597 (1976). Furthermore, "a violation of the equal protection clause occurs only when, *inter alia,* the governmental action in question classifies between two or more relevant persons or groups." *Vera v. Tue,* 73 F.3d 604, 609–610 (5th Cir.1996). The plaintiffs in the instant case have not shown that Chief Wilson classified between two or more relevant groups when he selected Commanders and made transfers. Thus, this court is unable to ascertain any link between the policy in question and any violation of the right to equal protection. The proof shows instead that Chief Wilson's actions were arbitrary and deliberately abusive of his governmental authority. If there has been an abuse of governmental authority, then a due process analysis may more readily lead to a link between the policy in question and a constitutional violation. *See Salas v. Carpenter,* 980 F.2d 299, 307 (5th Cir.1992) (a procedural or substantive due process violation could occur if a state official causes injury by arbitrarily abusing governmental power).

### 3. Due Process under the Fourteenth Amendment

Under traditional notions of due process, the Fourteenth Amendment was "intended to secure the individual from the arbitrary exercise of the powers of government" which resulted in grievous losses for the individual. *See Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). The protections of the Due Process Clause are only invoked when State procedures which may produce erroneous or unreliable results imperil a protected liberty or property interest. *Johnson v. Rodriguez,* 110 F.3d 299, 308 (5th Cir.1997), citing *Olim v. Wakinekona,* 461 U.S. 238, 250–251, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983). Since the United States Constitution does not create property rights, the plaintiffs in the instant case must be able to prove entitlement to be considered for promotion in accordance with the General and Special Orders of the Jackson Police Department. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (where there is a "legitimate expectation of entitlement," there is a property right).

A property interest must arise from an independent source such as state or federal statute, municipal ordinance or charter, an express or implied contract, or a contract implied from policies and practices of a particular institution. *Muncy v. City of Dallas, Tex.,* 335 F.3d 394, 398 (5th Cir.2003), citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) ("[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that

he may invoke at a hearing"). Where there is a "legitimate expectation of entitlement," there is a property right. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Moreover, "the types of interests protected as property are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Logan v. Zimmerman,* 455 U.S. 422, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982).

 This court finds that a due process violation has been established by the evidence presented. First, all officers of the Jackson Police Department who had attained the rank of Sergeant and above as of July 1, 1992, had a legitimate expectation of entitlement to be considered for the positions of Commander in accordance with the provisions of General Order 100–5. The modification of General Order 100–5 in January of 1994 did not retroactively supplant this expectation.

Secondly, all the plaintiffs, if they met the qualifications for any of the transfers in question, had a legitimate expectation of entitlement to be considered for desirable transfers in accordance with General Orders 200–20 and 300–2. The evidence shows that the applicable General Orders were ignored by Chief Wilson, thereby denying the plaintiffs qualified for the transfers in question their rights to due process.

Therefore, this court finds a link between the City of Jackson's policy and a constitutional rights violation based upon the legitimate expectations of entitlement of those officers having attained the rank of Sergeant or above to be considered for promotion to Commander; and upon the right of all qualified officers to be considered for transfer in accordance with the policy set forth in general Orders 200–2 and 300–2, as well as the Civil Service Rules of the City of Jackson. However, as for all the other assertions by the various plaintiffs who testified, this court finds no basis for imposing liability upon the City of Jackson under § 1983.

### 4. The Individual Claims

This court carefully has considered the various individual claims asserted by the defendants. Like the claims relating to the Commander positions and transfers, the individual claims are brought pursuant to Title 42 U.S.C. § 1983. Inasmuch as the City of Jackson is the only defendant in this cause, the individual plaintiffs raising these claims must show that they are based upon the implementation or execution of a policy or custom which was officially adopted by that body's officers. *Krueger v. Reimer,* 66 F.3d at 76. This court finds that most of these individual claims do not sufficiently support the finding of any violation of a constitutional right due to any particular policy by the City of Jackson. However, to the extent that any of these claims establish a due process violation for not being appointed to the position of Commander or not being transferred to a more desirable position in accordance with the policies and procedures set forth in the applicable General Orders, these claims already are addressed in this court's forgoing discussion of the due process violations which have occurred. A brief summary of the individual claims is again in order.

Officer Lawrence Epps testified that he was not considered for any Commander position, but he did not hold at least the rank of Sergeant between 1992 and 1994. Former Officer Cordilia Bailey stated that she simply resigned from the force because she was not considered for promotion and did not believe she ever would be considered. Officer Brian Carver complained that he was not considered for the Homicide/Robbery vacancy, but admitted that he did not qualify for the position.

Officer Keith Freeman complained that two of his classmates were permitted to take detective positions even though they were not qualified for the positions. Freeman did not say that he was qualified to be a detective. However, if he was, then his claim is already addressed above in this court's discussion of due process. Similarly, Officer James McGowan testified that he was not permitted to compete for vacancies in the Fugitive Unit, the K–9 Division, or the Homicide/Robbery Division, but did not indicate whether he met the minimum qualifications for these positions. If he is qualified, then his claim also is addressed in this court's due process discussion.

■ The claims of Officers Calvin Matthews, Larry Gatewood, Charles M. Foreman, James French and James McGowan simply do not raise any cognizable constitutional issue. No authority is cited by these plaintiffs to show that imposing greater job responsibility without additional compensation; failure to provide the best communications equipment or physical security; denial of a clothing allowance; or being misled into becoming a police officer due to promises of advancement and pay raises give rise to a violation of any constitutionally protected rights or liability under § 1983.

The claims of Sergeant Bidwell Owens and Officers Derric Hearn and Jeff Myers based on their First Amendment claims have already been addressed and denied.

Officer Jonathan Crawford testified that he was moved to another shift because he told the girlfriend of an interim Chief of Police that he was making more money on his part-time job. Section 1, Rule VIII of the Civil Service Rules of the City of Jackson, provides that transfers and reassignments are within the discretion of the department head. While Crawford suggests that his transfer necessitated the relinquishment of his part-time job, there is nothing before the court other than Crawford's assertions which would support a showing of abuse of supervisory discretion with regard to Crawford's transfer.

■ Officer Derric Hearn also testified that he was prohibited from applying for positions in the Drug Enforcement Unit and the Special Investigation Division in Internal Affairs because he lacked the requisite years-in-service. The years-in-service requirement, said Hearn, was not required of other officers who applied for these vacancies. This court has heard only Hearn's bare assertion regarding this matter. Moreover, Paragraph 1.6, Section 8, Rule VI of the Civil Service Rules for the City of Jackson, clearly provides that the time-in-grade requirement applies to employees seeking to apply for the next higher rank. Hearn does not assert that he was seeking to apply for the next higher rank. If he was applying for a next higher rank, then the requirement was proper. However, Hearn offers nothing to clarify what the positions with the Drug Enforcement Unit and the Special Investigation Division required, who applied for them, or who was assigned to them who did not meet the basic qualifications. The evidence simply is not sufficient to establish that there was a policy instituted by the City of Jackson which kept Hearn from rightfully being considered.

■ Officer Nicky Temple testified that he was asked to direct an officer to quit giving out traffic tickets on a particular thoroughfare, notwithstanding state law which requires ticketing persons who travel too slowly and consistently in the left lane. This court finds no constitutional violation asserted by Temple's testimony.

Officer William Gladney testified that disciplinary action was taken against him

in order to keep him from taking a promotional test. Gladney acknowledged that he received disciplinary action because of an unexcused absence. According to Rule XII, Section 2, paragraph 1.1 P., absence without leave constitutes cause for disciplinary action. Officer Gladney does not allege that the discipline was improper. He contends that the discipline should not have been imposed because, in his view, he was simply late for work on the day in question. Officer Gladney's testimony shows that he was absent for a period of time and was disciplined for that absence. This testimony simply does not support Gladney's contention that he was disciplined to keep him from taking an examination.

Gladney also testified that he was demoted from his position as case management officer; given an old marked car in place of his newer unmarked car; and forced to reapply for the case management position that he had held for 14 years. Gladney attempts to lay a foundation for an equal protection claim by stating that the requirement to reapply for his position as a case manager was never required of any other division head. Gladney acknowledged though that everyone who worked in this division was required to reapply for their positions. This court finds no basis for relief under § 1983 based on the testimony presented.

Officer Alvaline Baggett testified that while she was assigned to the Vice and Narcotics Division, she was treated differently from the other four officers assigned to that division in that she was prohibited from attending the training seminars her male co-workers were permitted to attend. Officer Baggett says she was transferred to a less desirable shift which resulted in the loss of her part time job after she complained about this matter. It is undisputed that Baggett's transfer occurred in 1995, well after Chief Wilson had left his post as Chief of Police. Furthermore, Baggett acknowledged that her transfer to another shift was not beyond the discretionary authority of either her commander or the current Chief of Police. Baggett's individual assertions simply do not present sufficient information for this court to conclude that a constitutional violation has occurred.

■ Finally, Officer Virvil Finely testified that he was ordered to make controlled purchases of illegal drugs without being outfitted with a means of communicating with his supporting officers. Finely says that his request for a device was denied and that he was once threatened by a drug dealer with a shotgun. According to Finely, another female member of the same unit in which he served was always outfitted with communication devices when making controlled drug purchases. Officer Finely did not explain the circumstances into which the female officer was ordered to make purchases. Moreover, the limited testimony presented to this court does not eliminate the possibility that Officer Finely's commander believed a communications device, if detected on Finely by the drug dealers, would place Finely in a far more dangerous situation. Thus, this court is unable to conclude from the evidence presented that there has been an equal protection violation which may be remedied under § 1983.

■ Officer Finely also complains that his clothing allowance was taken away when he served with the D.A.R.T. unit. Just as the other plaintiffs who raised this issue, Finely acknowledged that the decision to terminate the allowance was based on the exceptional amount of overtime pay the members of this unit were receiving. This court finds no basis for concluding that there was a violation of anyone's con-

stitutional rights merely because a clothing allowance was discontinued.

Therefore, other than the due process violations discussed previously, this court finds no additional constitutional violations from the foregoing summarized testimony which may be linked to a policy of the City of Jackson and which would justify further relief under § 1983.

## VI. THE MATTER OF PROMOTIONAL TESTING

This court heard testimony from Essie "Pete" Johnson, personnel specialist with the City of Jackson, and from Betsy Sempco, an industrial psychologist whose company prepared the competitive test for the position of Sergeant with the Jackson Police Department. This court finds nothing concerning this test or its outcome to support a finding of any constitutional violation which would justify relief pursuant to § 1983.

## VII. THE MATTER OF DAMAGES

 According to plaintiffs' counsel, each of the plaintiffs seeks the amount of $10,000.00 in monetary damages (about $1.7 million dollars total) for violations of their constitutional rights as well as injunctive relief. In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the United States Supreme Court stated the well-established rule that in order to collect money damages, plaintiffs in § 1983 procedural due process actions must prove that they have been injured. *Id.*, 98 S.Ct. 1042, 1047–49. Compensatory damages then may not be presumed, but must be proven. *Kinsey v. Salado Independent School District*, 916 F.2d 273, 282 (5th Cir.1990), citing *Carey v. Piphus*, 98 S.Ct. at 1052–53. In *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986),

the Supreme Court held that the emphasis in *Carey v. Piphus* on compensation for actual injury applied to all § 1983 cases. The *Stachura* Court also stated that no compensatory damages may be awarded in a § 1983 suit based upon some abstract value of a constitutional right. *Id.*, 106 S.Ct. at 2543. That damage awards in actions brought under § 1983 should "provide fair compensation for injuries caused by the deprivation of rights" is not debatable. *Carey v. Piphus*, 435 U.S. at 258, 98 S.Ct. 1042. Further, compensatory damages pursuant to § 1983 are governed by common law tort principles. *See Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir.1994). Damages for emotional harm, however, are recoverable "only when a sufficient causal connection exists between the alleged injury" and "only when claimants submit proof of actual injury," *Patterson v. P.H.P. Healthcare Corporation*, 90 F.3d 927, 938 (5th Cir.1996). In *Patterson*, the Fifth Circuit explained that

> in order to establish tangible loss, we recognize that *Carey v. Piphus* requires a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award. Hurt feelings, anger and frustration are a part of life. Unless the cause of action manifests some specific discernible injury to the claimant's emotional state, we cannot say that the specificity requirement of Carey has been satisfied." *Id.* at 940; *see also Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir.1998) ("Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages."); *Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir.1983) ("Mere proof of the violation of a right will not

support an award of compensatory damages.").

*Id.*

■ In the instant case, some of the plaintiffs have shown that their constitutional due process rights were violated, but this showing alone does not establish entitlement to monetary damages. Plaintiffs have made no proof of injury with the degree of specificity required, and have presented no corroborating testimony or medical or psychological evidence in support of the injury which would justify a compensatory damage award. As the above case cite states, hurt feelings, anger and frustration are a part of life and are not themselves sufficient to establish one's entitlement to compensatory damages.

■ Of course, as the Supreme Court and the Fifth Circuit have emphasized, a party who proves a violation of his constitutional rights is entitled to nominal damages even when there is no actual injury. *Stachura,* 106 S.Ct. at 2544 n. 11; *Carey v. Piphus,* 98 S.Ct. at 1053–54; *Mann v. Smith,* 796 F.2d 79, 86 (5th Cir.1986); *Ryland v. Shapiro,* 708 F.2d 967, 976 (5th Cir.1983); *Familias Unidas v. Briscoe,* 619 F.2d 391, 402 (5th Cir.1980). In *Carey v. Piphus,* the Supreme Court explained the reason for this rule: "By making deprivation of such [constitutional] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." Far from taking no notice of constitutional violations, the law awards nominal damages when such violations occur without causing injury even though no damages will lie for other, lesser torts that do not cause injury. 98 S.Ct. at 1054.

■ In the instant case, this court finds that all those officers who had attained the rank of Sergeant as of July 1, 1992, the time the Commander position was set forth on General Order 100-5, have shown that their rights to due process were violated by Chief Wilson's abuse of his governmental authority and his decision to deviate from the policy set forth in the General Orders of the Jackson Police Department, the Civil Service Rules of the City of Jackson, and the applicable Consent Decrees when he selected persons other than those who carried the rank of Sergeant and above to fill Commander positions. While the officers testified that Chief Wilson's failure to follow established policy concerned and angered them, none of them has complained of or testified about any physical ailments or have provided the court with medical documentation which could support a claim of some ascertainable emotional or psychological injury.[17] No doctors or psychiatrists have testified. Generally, a claimant is expected to present such testimony and/or other evidence to show the nature and extent of any emotional harm caused by an alleged violation. *See Patterson v. P.H.P. Healthcare Corporation,* 90 F.3d 927, 938 (5th Cir.1996) (holding a claimant's testimony alone not sufficient to support anything more than a nominal damage award).[18]

---

17. Officer Gwendolyn Nix became very emotional while testifying about Chief Wilson's lack of concern for her after she was selected for transfer to Fugitive Unit of the Jackson Police Department. Officer Nix is not a Sergeant. Moreover, she is one of the officers actually selected for a desirable transfer. Notwithstanding, her emotional testimony, this court does not find a compensable injury under these circumstances.

18. *See Forsyth v. City of Dallas,* 91 F.3d 769 (5th Cir.1996), where a jury's award of $100,000 in emotional anguish damages to police officer who had been transferred from intelligence unit to night uniformed patrol after making allegations of illegal wiretapping

Otherwise, the evidence presented does support the conclusion that these plaintiffs' rights to due process under the Fourteenth Amendment to the United States Constitution were violated. Thus, mindful of the above jurisprudence, this court finds that those plaintiffs are entitled only to nominal damages.

In *Carey v. Piphus*, the United States Supreme Court recognized the prerogative of courts to award what it called "a nominal sum of money" when a violation of one's rights does not result in actual injury, and awarded nominal damages of one dollar. As recently noted by the Fifth Circuit in *Williams v. Kaufman County*, 352 F.3d 1013, 1014–15 (5th Cir.2003), the United States Supreme Court in 1978 did not indicate that one dollar was the outer limit of such damages. The *Kaufman* Court observed that, "[a]lthough $100 is obviously greater than one dollar, this amount is certainly not out of line with nominal damages that we have awarded in the commercial state law context.... In the commercial context, we have awarded $2000 in nominal damages and cited as guidance state courts that have awarded between $500 and $5000 in nominal damages for commercial disputes." *See Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1491 (5th Cir.1990).

█ This court is unable to ascertain which officers were qualified for the various transfers to desirable positions within the Jackson Police Department between 1992 and 1994. In this court's view, only those officers who met the minimum qualifications for the various vacancies between 1992 and 1994 and who were passed over in favor of an employee who did not meet the qualifications for the specific vacancy would be entitled to relief in this case. Those officers who did not meet the minimum qualifications for these vacancies would not have been considered for transfer even if Chief Wilson had followed the General Orders of the Jackson Police Department and the Civil Service Rules.[19] Thus, this court is unable to conclude that the officers who did not meet the minimum qualifications in the first place suffered any violation of their constitutional rights.

For instance, the evidence presented shows a vacancy occurred in the Homicide/Robbery Division which required that candidates must have at least three years of experience; must have attended training seminars; and must have completed the Jackson Police Department's basic investigative course. Officer James Cox testified that he filed a grievance after Officer Amy Barlow was selected for this vacancy because she was not qualified. However, Officer Cox admitted that he was not qualified and had not applied for the job because he had not completed the Jackson Police Department's basic investigative course. Jeff Myers also testified that he was not selected for this vacancy, but he did not state that he met the qualifications for the job.

Other officers testified that they were not considered for transfers to desirable vacancies within the Jackson Police Department. Officer Brian Carver with K–9 investigations said he was not considered for the Homicide/Robbery vacancy, but he

within police department was supported by officer's testimony that she suffered depression, weight loss, intestinal troubles, and marital problems, that she had been sent home from work because of her depression, and that she had to consult psychologist.

19. Rule V, Section 2, paragraph 1.2, provides that "in order to become an applicant, the interested person must meet the minimum qualifications prescribed for the announced/authorized position." Pursuant to Rule VI, Section 9, Rule V is applicable to the Jackson Police Department.

admitted that he was not qualified for the position. Former Officer Cordlia Bailey testified that she quit the Jackson Police Department due to lack of advancement.

Moreover, none of the officers complaining about transfers made a satisfactory showing of actual injury as is required pursuant to *Carey v. Piphus*. Nevertheless, any officer complaining about Chief Wilson's transfer practices would be entitled to nominal damages in this case if the officer has shown that he or she was qualified for, but not considered for, a transfer which he or she sought to obtain, or was passed over in favor of someone who was not qualified for the transfer. This court recollects no such proof. Although this court finds that Chief Wilson failed to follow the proper procedures for considering transfers, none of the plaintiffs has submitted the appropriate proof to show that any were harmed. The bulk of the testimony simply manifested entitlement to a transfer, notwithstanding qualifications, because someone else, equally unqualified, had gotten one. Without a showing of qualification and entitlement for a transfer, this court must deny any damages to the plaintiffs under this category.

■ As earlier stated, however, this court is satisfied that some of the plaintiffs have shown that Chief Wilson's promotion-to-Commander policy was improper. These plaintiffs, that is, those who had attained the rank of Sergeant as of July 1, 1992, however, have presented no evidence to show what harm they suffered or any other quantifiable loss as a result of Chief Wilson's actions. Still, this court finds that these plaintiffs, having shown a violation of their constitutional due process

rights, are hereby entitled to an award of nominal damages in the amount of $500.00. Those officers are Sergeant Louie Brooks, Sergeant Walter Ainsworth, Sergeant Watson Marsalis, and Sergeant Jerry W. Barrett.[20]

Inasmuch as this court is unable from the testimony presented to determine which, if any, of the plaintiffs were qualified for and denied transfer due to Chief Wilson's conduct, this court can find no basis for awarding nominal damages to any plaintiff as the result of being denied a transfer.

■ Next, the plaintiffs also request punitive damages. Punitive damages are indeed recoverable under § 1983. *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *Hale v. Fish*, 899 F.2d 390, 404 (5th Cir.1990); however, the awarding of such damages is not available against a municipal defendant. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981) ("A municipality ... can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself."); *Webster v. City of Houston*, 735 F.2d 838, 860 n. 52 (5th Cir.1984); *Walters v. City of Atlanta*, 803 F.2d 1135, 1148 (11th Cir.1986).

■ Next, the plaintiffs seek injunctive relief. The position of Commander has been abandoned and the City of Jackson is back to operating under the prescribed rank structure. To award injunctive relief, this court must have before it a "case or controversy" within the meaning of *Musk-*

---

**20.** These four plaintiffs were the only ones to testify that they held the rank of Sergeant at the time of the events in question. This court has reviewed the list of plaintiffs, but has been unable to identify the others. Still, if plaintiffs' counsel can point the court to any admitted exhibit identifying other plaintiff-Sergeants, this court will consider their inclusion in this award, after the City has responded to any such request.

*rat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Holland America Insurance Company v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985). Moreover, "there must be more than a mere possibility or fear that the injury will occur" in order for this court to be justified in granting injunctive relief. *Holland,* 777 F.2d at 997.

While the remote possibility of similar future conduct may exist in the instant case, this mere possibility is not sufficient for an award of injunctive relief and the case and controversy predicated on the actions of Chief Wilson now has evaporated. Thus, this court finds that the plaintiffs' request for injunctive relief with regard to the conduct of Chief Wilson in selecting persons for the position of Commander is now moot.

## VIII. THE MATTER OF ATTORNEY FEES

Finally, the plaintiffs request attorney fees pursuant to Section 1988 of Title 42 United States Code which provides in part that, "[i]n any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985 and 1986 of this title ..., the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." Accordingly, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Blanchard v. Bergeron,* 489 U.S. 87, 89, 109 S.Ct. 939, 942, 103 L.Ed.2d 67 (1989).

The plaintiffs may be considered prevailing parties for attorneys' fee pur-poses if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. Here, some of the plaintiffs have prevailed in this litigation sufficiently for attorney fee purposes under § 1988.

The United States Supreme Court in *Hensley* held that, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. The product of these two factors—number of hours and the hourly rate—is known as the "lodestar." *Mid–Continent Cas. Co. v. Chevron Pipe Line Company,* 205 F.3d 222, 232 (5th Cir.2000); *League of United Latin American Citizens (LULAC) v. Roscoe Independent School District,* 119 F.3d 1228, 1232 (5th Cir.1997).

The fee applicant bears the burden of proving the reasonableness of the number of hours claimed. *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933; *Cooper v. Pentecost,* 77 F.3d 829, 832 (5th Cir.1996). This court will reduce the fee award if the documentation of hours is inadequate. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. This court also will reduce the award where the hours are "excessive, redundant, or otherwise unnecessary." *Id.* at 434, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40.

The fee applicant also bears the burden of proving the reasonableness of the hourly rate claimed. *Blum v. Stenson,* 465 U.S. 886, 895–96, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). In *Blum,* the United States Supreme Court explained that, "[t]o inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in

line with those prevailing in the community for similar services ·by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to, for convenience, as the prevailing market rate." *Blum,* 465 U.S. at 895–96, 104 S.Ct. 1541.

■ Once the lodestar has been calculated, this court then will address its reasonableness as a whole. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933; *Longden v. Sunderman,* 979 F.2d 1095, 1099 (5th Cir. 1992). In doing so, the district court will consider those factors set out by the United States Court of Appeals for the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).[21]

Therefore, counsel for the plaintiffs shall submit a motion for attorney fees in accordance with Rule 54.2(B) of the Uniform Rules of this court. Meanwhile, this court will enter a separate judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

**21.** The Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19; *Singer v. City of Waco, Texas,* 324 F.3d 813, 829 (5th Cir. 2003).